Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.

**FILED**

Aug 31 2012, 8:44 am

*Kevin S. Smith*

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANTS:

**PHYLLIS EMRICK**
Deputy Public Defender
Bloomington, Indiana
for Mother

**JASON MEREDITH**
Deputy Public Defender
Bloomington, Indiana
for Father

ATTORNEYS FOR APPELLEES:

**ANNA M. SEBREE**
Indiana Department of Child Services
Bloomington, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

**AMY G. APPLEGATE**
Bloomington, Indiana
for David Semmel,
Court Appointed Special Advocate

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of S.S., minor child, and D.S., mother, and W.S., father: | ) ) ) ) |
| D.S. and W.S., | ) ) |
| Appellants-Respondents, | ) ) |
| vs. | ) )    No. 53A05-1112-JT-673 |
| INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) ) |
| Appellee-Petitioner. | ) |

APPEAL FROM THE MONROE CIRCUIT COURT
The Honorable Stephen R. Galvin, Judge
Cause No. 53C07-1010-JT-743

**August 31, 2012**
**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**KIRSCH, Judge**

D.S. ("Mother") and W.S. ("Father") appeal the involuntary termination of their parental rights to their child, S.S. In so doing, the parents challenge the sufficiency of the evidence supporting the trial court's judgment.

We affirm.

## FACTS AND PROCEDURAL HISTORY

Mother and Father are the biological parents of S.S., born in August 2006.[1] The facts most favorable to the trial court's judgment reveal that S.S. was born testing positive for cocaine. The local Monroe County office of the Indiana Department of Child Services ("MCDCS") was notified and began providing services to the family, including a referral for Mother to attend an intensive out-patient drug rehabilitation program ("IOP"). The child was initially allowed to remain in the family home.

Mother's and Father's participation in home-based services during the ensuing months was inconsistent. Mother also failed to regularly attend the IOP classes and continued to use cocaine and marijuana while caring for S.S. In March 2007, S.S. was removed from the family home and placed in relative foster care with the maternal grandmother following an incident of domestic violence that occurred while the child was in the parents' care. During this incident, Father repeatedly hit Mother in the head with an iron tool used on truck tires. Mother was taken to the hospital and received six staples in the head. At that time, Mother reported that Father drank alcohol every day and physically abused her at least twice per month.

---

[1] For clarification purposes we observe that Mother and Father were married in January 2007 and divorced in April 2011. Each parent has filed an Appellant's Brief and made separate arguments in this consolidated appeal.

Father, who also stabbed a third individual during this domestic disturbance, was arrested and later pleaded guilty to Class D felony criminal recklessness and Class A misdemeanor domestic violence. Father received a suspended sentence, subject to various conditions of probation, which he admittedly violated on multiple occasions. Although probation revocation petitions were filed against Father in October 2006 and August 2008, his probation was not revoked at that time.

Following S.S.'s removal from the family home, the trial court adjudicated S.S. to be a child in need of services ("CHINS"). Mother's participation in court-ordered reunification services continued to be sporadic. Moreover, Mother attempted three separate drug treatment programs, but failed to complete each one. She also continued to use cocaine regularly. Father, on the other hand, completed anger management classes and drug treatment services offered through Centerstone, a local mental health facility. Based on Father's compliance with these court-ordered services, the CHINS case was ordered closed in March of 2008, and custody of S.S. was placed with Father, who had signed a Legal Separation Agreement, providing that all of Mother's parenting time would be supervised and that MCDCS would be notified immediately if there were any changes to the custody agreement and/or parenting time.

On March 17, 2009, Father violated the terms of the Legal Separation Agreement and left S.S. in the care of Mother, unsupervised, while he went on a long-haul trucking job. While away, Father was arrested in New Mexico on federal drug-trafficking charges after police discovered 258.5 kg of marijuana in his semi-truck. This was another violation of the terms of his probation.

3

Father was released from incarceration in New Mexico on March 29, 2009. As part of the terms of his conditional release, Father was ordered to, among other things, refrain from the use of any alcohol, narcotic drug, or other controlled substance. Father was also prohibited from possessing any dangerous weapons. Father ignored the conditions of his release, returned to Indiana, and resumed drinking alcohol on a daily basis.

In August 2009, Father again physically struck Mother in the presence of S.S. He also threatened Mother with a sheathed Bowie knife. During this incident, S.S. could hear her mother's screams. The police were called, and Father was arrested on Class D felony domestic battery and intimidation charges. This arrest violated both the terms of Father's probation for the 2007 battery against Mother, as well as the terms of his conditional release for the federal drug trafficking case in New Mexico. Father was originally detained in the Monroe County Jail, and then was eventually transferred to federal prisons in Terre Haute, Indiana, and Littleton, Colorado.

As a result of the August 2009 incident, S.S. was taken into immediate protective custody and again placed with the child's maternal grandmother. S.S. was soon removed from the grandmother's care, however, and placed in licensed foster care when MCDCS discovered that the grandmother was living with a relative who was a known sex offender with a history of molesting family members, and the grandmother refused to ask the relative to move out of her home.

Meanwhile, MCDCS filed a new CHINS petition ("second CHINS case"). Following a hearing on this petition in February 2010, S.S. was so adjudicated. The trial

4

court again issued a dispositional order directing both parents to complete a variety of tasks and services designed to facilitate reunification including: (1) obtaining suitable housing; (2) refraining from the use of illegal drugs; (3) submitting to random drug screens; and (4) participating in a domestic violence assessment as well as actively engaging in any recommended services. Father was also ordered to obtain a substance abuse and psychological assessment, refrain from all acts of domestic violence, participate in a domestic violence support group, and enroll in any parenting education services that may be available at his place of incarceration.

Throughout the next year, Mother continued to test positive for cocaine and marijuana. She produced multiple positive drug screens in February, March, August, and September of 2010, as well as positive screens in March, May, and September of 2011. Although Mother failed to successfully complete substance abuse treatment following S.S.'s birth and during the first CHINS case, when the second CHINS case was pending, Mother completed a day treatment program in October 2009, as well as IOPs in December 2009, February 2010, and June 2010. In each instance, however, Mother relapsed almost immediately after completing the treatment program.

Notwithstanding Mother's recurrent drug rehabilitation failures, S.S. was placed with Mother for a trial in-home visit on July 22, 2010, after demonstrating a brief period of sobriety. S.S. was removed from Mother less than two months later, on September 15, 2010, because Mother had tested positive for cocaine twice, once in August and again in September. The following month, MCDCS filed a petition seeking the involuntary termination of both Mother's and Father's parental rights to S.S.

5

A three-day evidentiary hearing on MCDCS's termination petition was held in June, July, and October 2011 to allow Father, who remained incarcerated, to participate telephonically. During the termination hearing, MCDCS presented substantial evidence concerning both parents' failure to successfully complete and/or benefit from the many court-ordered reunification services throughout the underlying CHINS and termination cases. In addition, MCDCS established that both parents remained incapable of providing S.S. with a safe and stable home environment for many reasons, including the facts that Mother continued to struggle with her addiction to cocaine and marijuana, and Father remained incarcerated with a projected earliest release date of December 2012.

Additional evidence presented during the termination hearing as to Mother further established that she still did not have stable housing. Mother also freely admitted that although she had completed yet another residential drug treatment program at the Salvation Army Harbor Light Center in July 2011, she continued to use marijuana regularly after her discharge. Mother went on to explain that cocaine was her true problem and that marijuana simply relaxes her. Notwithstanding this most recent drug treatment program, Mother tested positive for cocaine in July 2011, just two days after her completion of this program, and again in September 2011.

As for Father, MCDCS introduced evidence establishing Father had not seen S.S. since his August 2009 arrest for battery, and that at the time of the termination hearing, Father remained incarcerated, serving a sixty-month sentence on his federal drug trafficking conviction. In addition, Father's projected earliest release date at the time of the termination hearing was December 26, 2012, to be followed by a six-month period of

6

living in a half-way house located in Ohio, and four additional years of supervised parole. Although Father participated in six hours of anger management counseling while incarcerated, he had failed to complete a majority of the trial court's dispositional goals.

At the conclusion of the termination hearing, the trial court took the matter under advisement. On November 29, 2011, the court entered its judgment terminating both Mother's and Father's parental rights to S.S. Both parents now appeal.

## DISCUSSION AND DECISION

We begin our review by acknowledging that this court has long had a highly deferential standard of review in cases concerning the termination of parental rights. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*.

Here, in terminating Mother's and Father's parental rights, the trial court entered specific findings and conclusions.[2] When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005).

---

[2] We commend the trial court for the thoughtful and detailed findings and conclusions set forth in its judgment, which greatly aided this court in its review.

7

First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the trial court's decision, we must affirm. *L.S.*, 717 N.E.2d at 208.

The "traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. These parental interests, however, are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate parental rights. *Id.* In addition, although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *K.S.*, 750 N.E.2d at 836.

Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

(B)    that one (1) of the following is true:

    (i)    There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii)    There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

    (iii)    The child has, on two (2) separate occasions, been adjudicated a child in need of services; [and]

(C)    that termination is in the best interests of the child; and

8

(D)    that there is a satisfactory plan for the care and treatment of the child.

Ind. Code Ann. § 31-35-2-4(b)(2).[3]   The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'"  *In re G.Y.*, 904 N.E.2d 1257, 1260-1261 (Ind. 2009) (quoting Ind. Code § 31-37-14-2 (2008)). Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a).  Mother and Father each challenge the sufficiency of the evidence supporting the trial court's findings as to subsections (b)(2)(B) thru (D) of the termination statute cited above.

### I. Conditions Remedied/Threat to Well-Being

Indiana Code section 31-35-2-4(b)(2)(B) requires the trial court to find that only one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence before terminating parental rights.  Here, the trial court determined that the first two elements of subsection (b)(2)(B) had been established.  Because we find it to be dispositive under the facts of this case, however, we shall only discuss whether MCDCS established, by clear and convincing evidence, that there is a reasonable probability the conditions resulting in S.S.'s removal or continued placement outside of each parent's care will not be remedied.  *See* Ind. Code § 31-35-2-4(b)(2)(B)(i).

---

[3] We observe that Indiana Code section 31-35-2-4 was amended by Pub. L. No. 48-2012 (eff. July 1, 2012).  The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

When making such a determination, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied.* The court must also "evaluate the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of the child." *Id.* Pursuant to this rule, courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cnty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied.* The trial court may also consider any services offered to the parent by the county department of child services and the parent's response to those services, as evidence of whether conditions will be remedied. *Id.* Moreover, MCDCS was not required to provide evidence ruling out all possibilities of change; rather, it needed to establish only that there is a reasonable probability the parents' behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

On appeal, Father argues that S.S. was removed from his care due to "domestic violence issues" he had with Mother and because of his own incarceration. *Appellant Father's Br.* at 6. Although Father admits he has "not been able to take a specific domestic violence course" while incarcerated, he claims that "domestic violence issues were covered in his anger management class." *Id.* at 7. Father goes on to assert that he has divorced Mother, and is "clearly in the process of remedying the conditions that caused S.S.'s removal from his care[.]" *Id.* Mother likewise asserts that because of her

divorce from Father, domestic violence is no longer an issue. She further claims that "throughout [MCDCS's] involvement in her life, [she] has complied with recommendations regarding drug treatment" and as a result has learned "new ways of thinking." *Appellant Mother's Br.* at 6. Although Mother acknowledges she has had numerous drug relapses during the underlying proceedings, she claims she is "clearly in the process of remedying the conditions that caused S.S.'s removal from her home." *Id.* at 7. Both parents therefore contend that the trial court's determination that there is a reasonable probably the conditions leading to S.S.'s removal from their respective care will not be remedied is clearly erroneous.

In terminating Mother's and Father's parental rights, the trial court made extensive findings regarding Mother's unresolved substance abuse issues, parenting deficiencies, and lack of stability. Specifically, the court found that Mother: (1) "admits" that she has been addicted to cocaine since 2003; (2) gave birth to S.S., who tested positive for cocaine, in 2006; (3) continued to "regularly use[]" drugs, including cocaine, in 2006 and 2007; and (4) failed to complete substance abuse treatment during the first CHINS case despite S.S.'s removal from the family home. *Appellant Mother's App.* at 10-11. The court also noted in its findings that Mother's parental rights to two older children were involuntarily terminated in November 2005, and that although Mother participated in "four separate substance abuse treatment programs" during the second CHINS case, the treatment "has not been successful," because after completing "each of these programs, [Mother] relapsed almost immediately." *Id.* at 13. The court goes on to find that Mother "does not express guilt about what her drug use has done to [S.S.]" but instead

11

"minimizes the impact of her drug use on her child." *Id.* at 14. Moreover, the court

noted that Mother "does not call" S.S. between visits, "does not take advantage of longer

visits when they are offered," and does not "recognize that she lost parental rights to her

older children as a result of her drug problem." *Id.* Based on these and other findings,

the court concluded:

> [Mother] has been an active cocaine user since 2003. . . . [Mother] has repeatedly participated in substance abuse treatment over the last five years. She frequently does not complete treatment programs. When she does complete a treatment program, she immediately relapses. [Mother] has repeatedly stated that she does not believe that her cocaine and marijuana use is problematic. She sees no reason to change her behavior for the good of her child. . . .
>
> Although [Mother] visits with [S.S.] and has a bond with the child, she refuses to place [S.S.'s] interests ahead of her own. This pattern of drug use and child neglect by [Mother] has persisted throughout [S.S.'s] life. There is no reasonable probability that [Mother's] behavior will change.

*Id.* at 16.

As for Father, the trial court observed in its findings that Father had been "very

abusive" to Mother. *Id.* at 11. The court also detailed Father's extensive criminal history

and multiple criminal convictions for criminal acts that Father committed after S.S.'s

initial removal from the family home, including convictions for criminal recklessness,

domestic battery, and federal drug trafficking charges. Based on these and other findings,

the trial court concluded:

> [Father] has a history of domestic violence and substance abuse that adversely affects [S.S.]. [S.S.] was removed from his care in March, 2007 after [Father] beat [Mother] with an iron tool. He was arrested and convicted for Criminal Recklessness and Domestic Battery. He did not comply with the terms and conditions of his probation, committing numerous probation violations and a federal drug offense. He continued to batter [Mother] on a regular basis. Although he was well aware that

[Mother] was continuing to abuse cocaine, he left [S.S.] in her care for an extended period in March, 2009. He again battered [Mother] in [S.S.'s] presence in August 2009. [S.S.] was again removed.

[Father] is currently incarcerated in federal prison in Colorado. His current release date is December 26, 2012. Although [Father] claims to have participated in treatment programs while incarcerated, he refused to sign a release to allow [MCDCS] to obtain his federal prison records. His claims cannot be accurately verified. When he is released, he will be required to relocate to Cincinnati, Ohio[,] to live in a halfway house for six months. He will not be able to live with [S.S.] during this period. Further, [Father] must complete anger management treatment before [S.S.] would be safe in his care. This treatment can be expected to last two years.

. . . .

[Father] was offered services by [MCDCS] to address his anger management issues during the first CHINS proceeding. Although he completed services, he continued to batter [Mother] in [S.S.'s] presence. He also continued to engage in substance abuse and other criminal conduct. There is no reasonable probability that this pattern of behavior will be remedied upon his release from incarceration.

*Id.* at 17. Our review of the record leaves us convinced that ample evidence supports the trial court's findings cited above.

At the time of the termination hearing, both parents' respective abilities to provide S.S. with a safe, stable, and drug-free home environment remained largely unchanged. Regarding Father, MCDCS case manager Greg Miller ("Miller") confirmed that Father had been arrested and convicted on several criminal charges during the underlying CHINS cases including domestic violence, criminal recklessness, and drug trafficking. Because Father's earliest possible release date was not until December 2012, he continued to be unavailable to care for S.S. Moreover, Father's significant history of criminal activity and unresolved substance abuse and domestic violence issues made it impossible for the trial court to determine if and when Father would ever be able to safely

13

regain custody of S.S. following his eventual release from incarceration. This court has repeatedly recognized that "[i]ndividuals who pursue criminal activity run the risk of being denied the opportunity to develop positive and meaningful relationships with their children." *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied*.

Miller further testified that despite Father's completion of several court-ordered services, including anger management classes, during the first CHINS case, he subsequently had been unsuccessful in "controlling his anger" which remained a cause for concern. *Id.* at 128. Psychologist Jennifer Spencer ("Dr. Spencer") likewise informed the trial court that the six hours of anger management Father had received while incarcerated was "typically not enough to make a dent in the problem," and that normally two years of weekly anger management treatment was necessary "in order to make really substantial changes." *Id.* at 200. When asked to explain why Father "doesn't deserve more time to get out of prison and establish himself," Miller stated that "it's been too much time already." *Id.* Miller went on to testify that he also still had concerns regarding Father's ability to "control" his "drinking." *Id.*

Regarding Mother, although the evidence confirmed she eventually completed several of the court-ordered reunification services, including several IOPs and parenting classes during the second CHINS case, it was the general consensus among case workers and service providers that she had failed to benefit from any of these services. Moreover, testimony presented during the termination hearing makes clear that Mother still regularly smoked marijuana, was unable to comprehend how her drug use had negatively

impacted S.S.'s life, and remained incapable of providing S.S. with a safe and stable home environment.

Dr. Spencer informed the trial court during the termination hearing that that one of her "biggest concern[s]" regarding reunification was Mother's drug use. Dr. Spencer further testified that Mother "very much minimized" the effects her drug use had on her ability to parent S.S., as well as the "trauma" S.S. had been through. *Tr.* at 195. Dr. Spencer also stated that testing positive for drugs immediately after finishing a substance abuse program indicates that the treatment was "ineffective." *Id.* at 272.

Similarly, in recommending termination of Mother's parental rights to S.S., home-based counselor Melissa Richardson ("Richardson") recounted a conversation she had with Mother concerning Mother's addiction to illegal substances. During this conversation, Mother informed Richardson that she was "not an addict because [she had] never hit rock bottom because of [her] drug use." *Id.* at 406. When Richardson "pointed out that [Mother] had lost parental rights to two (2) children . . . prior to [S.S.] because of drug use," Mother's perspective concerning her drug use did not change. *Id.* Richardson further confirmed that Mother: (1) failed to successfully complete three drug treatment programs during the first CHINS case; (2) relapsed immediately following her completion of four different drug treatment programs during the second CHINS case; and (3) has never gone longer than four months without a positive drug screen during the underlying CHINS and termination cases.

Mother's own testimony lends further support to the trial court's findings. During the termination hearing, Mother admitted that she "is still using" illegal substances. *Id.* at

15

474. When asked whether she viewed marijuana as a problem, Mother answered, "No[,] not at all." *Id.* at 441. Mother went on to clarify that cocaine was her "unmanageable" drug, marijuana simply "relaxes" her, and so long as she tests negative for all other drugs, a positive screen for marijuana constituted a "clean" screen in her mind. *Id.*

As noted above, a trial court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration the parent's *habitual patterns of conduct* to determine the probability of future neglect or deprivation of the child. *D.D.*, 804 N.E.2d at 266. Moreover, where a parent's "pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, at the time of the termination hearing, Father was unavailable to care for S.S. and would remain unavailable for at least another one-and-a-half years due to his ongoing incarceration, projected release date of December 2012, and mandatory time to be served in a halfway house following his release from incarceration. Mother, on the other hand, had demonstrated a persistent unwillingness and/or inability to take the actions necessary to show she was capable of overcoming her addiction to marijuana and cocaine in order to provide S.S. with the safe, stable, and drug-free home the child deserves. Based on the foregoing, we conclude that the trial court's determination that there is a reasonable probability the conditions resulting in S.S.'s removal from both Mother's and Father's care will not be remedied. Both parents' assertions to the contrary amount to impermissible invitations to reweigh the evidence. *D.D.*, 804 N.E.2d at 265.

## II. Best Interests

We next consider Mother's and Father's assertions that MCDCS failed to prove termination of their respective parental rights is in S.S.'s best interests. In determining what is in the best interests of a child, the trial court is required to look beyond the factors identified by the Indiana Department of Child Services and look to the totality of the evidence. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In so doing, the court must subordinate the interests of the parent to those of the child. *Id.* The court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *Id.* Moreover, we have previously held that the recommendations by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *In re M.M.*, 733 N.E.2d 6, 13 (Ind. Ct. App. 2000).

In addition to the findings previously cited, the trial court made several additional pertinent findings relating to S.S.'s best interests. The trial court noted that S.S. was a "bright," "articulate," and "friendly" five-year-old child, but that she suffers from Post Traumatic Stress Disorder ("PTSD") and "extreme anxiety" due to the "significant amounts of domestic violence and neglect prior to removal." *Appellant Mother's App.* at 15. Although the court acknowledged that S.S. loves both her parents, the court further found that S.S. nevertheless is "both angry and afraid" of Father, is "very bonded" with her foster parents, and "does not demonstrate anxiety about being separated from her mother." *Id.* The trial court also found:

17

37.   [S.S.] was placed in her current foster home on May 19, 2010 . . . . Other than the brief stay in her mother's home, [S.S.] has lived with her foster family for the past 17 months.

38.   The foster parents . . . provide a loving and caring home. They have taken excellent care of [S.S.]. [Foster mother] is a clinical nurse specializing in child and adolescent psychology. [Foster father] is a Masters level mental health therapist. As Dr. Spencer notes, the "reason that [S.S.] does not have more serious psychological issues is because her foster family has provided exceptional care in a therapeutic environment."

39.   [S.S.] exhibits separation anxiety about being removed from [the foster parents'] care. She worries that she will be "snatched" from them. When [S.S.] has nightmares, she crawls into bed with the foster parents. She turns to the foster parents for comfort and safety.

40.   As noted by Dr. Spencer, it is extremely important that [S.S.] remain with her foster parents. Given her history, she is at high risk to develop Reactive Attachment Disorder and to experience dissociative episodes. These risks would greatly increase if she were removed from the foster parents.

41.   [S.S.] expresses continuing concern about what will happen to her. She tells her foster parents that these are her "maybe days."

*Id.* Based on these and other findings, the trial court concluded that S.S. has been "profoundly affected" by the domestic violence and drug abuse in her parents' home. *Id.* at 17. The court further concluded:

> [S.S.] has twice been removed from her parents' care in the first five years of her life. These removals, and the subsequent changes in foster placement, have left this child with a deep concern about her future. She calls her days of waiting her "maybe days." [S.S.] is clearly in need of a safe, stable, and permanent home that she can call her own. Her parents cannot and will not provide this home.
>
> [S.S.] is currently in an excellent foster home that meets her needs. Her foster parents wish to adopt her. Clearly, termination of the parent-child relationship is in [S.S.'s] best interests.

*Id.* These findings and conclusions, too, are supported by the evidence.

18

In recommending termination of Mother's and Father's parental rights, Richardson informed the trial court that S.S. refers to her time living with Mother and Father as her "scary days." *Tr.* at 511. Although Richardson acknowledged that S.S. was bonded to both her parents and foster parents, she went on to state that S.S. felt "safe" with her foster parents and further described her demeanor as "joyful" while in the foster home. *Id.* at 492. Similarly, Dr. Spencer also recognized the bond between S.S. and both her parents and foster parents. Dr. Spencer nevertheless insisted that termination of parental rights and adoption by the foster parents was "very important" due to S.S.'s diagnosis of PTSD and heightened anxiety. In so doing, Dr. Spencer explained:

> [S.S.] has been remarkably resilient considering her background. She has all of the factors that you would see . . . in a child that develops reactive attachment disorder. The, uh, more she is moved from some place (sic) where she is bonded and well taken care of the risk for that developing just increases exponentially . . . . [B]ut I think one (1) of the reasons that she does not have that reactive attachment disorder diagnosis . . . is because she has been with this particular foster family. When she's been reunified[,] they've [the foster parents] maintained contact. When she's been removed[,] she's been returned to them. They have been consistent in her life. . . . [T]hey are also mental health care professionals themselves and . . . [have] provide[d] [S.S.] with not only good parenting and care but also they've done a lot of treatment with her so that she has not developed a much more serious diagnosis. And the reactive attachment disorder is not very treatable. Um, it's very much a broken child.

*Id.* at 225-26. Finally, CASA David Semmel ("Semmel") and case manager Miller also recommended termination of Mother's and Father's parental rights as being in S.S.'s best interests, noting that S.S. had experienced an "unsettled home life" almost all her life and now needed "permanency." *Id.* at 128, 537.

Based on the totality of the evidence, including both parents' significant histories of substance abuse, Father's ongoing incarceration and significant history of criminal

19

conduct, and both parents' current inability to provide S.S. with a safe and stable home environment, coupled with the testimony from Richardson, Dr. Spencer, Semmel, and Miller recommending termination of the parent-child relationships, we conclude that there is sufficient evidence to support the trial court's determination that termination of Mother's and Father's respective parental rights is in S.S.'s best interests. *See*, *e.g.*, *In re A.I.*, 825 N.E.2d 798, 811 (Ind. Ct. App. 2005) (concluding that testimony of court-appointed advocate and family case manager, coupled with evidence that conditions resulting in continued placement outside home will not be remedied, is sufficient to prove by clear and convincing evidence termination is in child's best interests), *trans. denied*.

### III. Satisfactory Plan

Finally, we consider whether sufficient evidence supports the trial court's determination that MCDCS has a satisfactory plan for the future care and treatment of S.S. Indiana Code section 31-35-2-4(b)(2)(D) provides that before a trial court may terminate a parent-child relationship, it must find there is a satisfactory plan for the future care and treatment of the child. Ind. Code § 31-35-2-4(b)(2)(D); *see also D.D.*, 804 N.E.2d at 268. It is well-established, however, that this plan need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *D.D.*, 804 N.E.2d at 268. MCDCS's plan is for S.S. to be adopted by her current, pre-adoptive foster parents. This plan provides the trial court with a general sense of the direction of S.S.'s future care and treatment. MCDCS's plan is therefore satisfactory.

This court will reverse a termination of parental rights "'only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made.'" *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997) (*quoting Egly v. Blackford Cnty. Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992)). We find no such error here.

Affirmed.

NAJAM, J., and MAY, J., concur.